**MOREA & SCHWARTZ, P.C.**
Aliza F. Herzberg (AH-1120)
120 Broadway, Suite 1010
New York, New York 10271
(212) 810-2400
*Attorneys for Plaintiff Nancy Ellman*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

NANCY ELLMAN,                                     :

                         Plaintiff,         :

                                           :         **COMPLAINT**

         -against-                              :

                                         :         ____ CIV. ____

XANBOO, INC., RDI, INC., WILLIAM DIAMOND      :
ROBERT L. DIAMOND and JAMES DIAMOND,          :

                    Defendants.        :

                                         :

------------------------------------------------------------------X

        Plaintiff, Nancy Ellman, by her attorneys, Morea & Schwartz LLP, alleges and avers as follows:

## NATURE OF THE CASE

        1.    This employment discrimination and equal rights lawsuit is brought against defendants Xanboo, Inc. ("Xanboo"), RDI, Inc. ("RDI") (Xanboo and RDI are collectively referred to as the "Companies"), William Diamond ("Bill"), Robert L. Diamond ("Bob") and James Diamond ("James") (collectively "the Diamonds")(all of the defendants are collectively referred to as "Defendants") under the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e et seq. ("Title VII"), the New York State Human Rights Law, N.Y. Executive Law §§ 290 et seq. ("State HRL"), and the New York City Human Rights Law, N.Y. City Administrative Code §§ 8-101 et seq. ("City HRL").

2.      Ms. Ellman has filed this lawsuit because Defendants have maintained a discriminatory workplace in which she was treated in a discriminatory fashion and denied compensation commensurate with men.  Men employed by the Companies were permitted to make sexually explicit and gender discriminatory comments in the workplace.  Additionally, Ms. Ellman suffered retaliation for opposing Defendants' unlawful employment practices.

3.      Ms. Ellman began work for the Companies as the Vice President of Program Management on October 1, 2001.  She was the only woman ever hired at the Vice President level or above.  She was the only woman in upper management during her tenure at Xanboo.

4.      During her first two years at the Companies, Ms. Ellman received favorable and laudatory feedback regarding her performance.

5.      After working for Defendants for some time, Ms. Ellman learned that her salary was less than other men who were less or no more qualified than Ms. Ellman.  Upon information and belief, women were generally paid less by the Companies than men in similar position.  Additionally, in October 2003, Bill began to discriminate against her by singling her out at meetings with male peers, and blaming her for issues that related to departments managed by her male peers.

6.      In November 2003, Ms. Ellman complained of discrimination to Xanboo's Chief Financial Officer, Gary Berg.  Also in November 2003, through counsel, Ms. Ellman complained to Bob and Bill, respectively the Chief Executive Officer and co-President of Xanboo and officers and shareholders of RDI.  Instead of performing a thorough investigation, Defendants immediately began a campaign of retaliation against

Ms. Ellman by, among other things, reducing her duties, responsibilities and authority, and interfering with her ability to perform her job. After Ms. Ellman followed up with further complaints of discrimination and retaliation, the Defendants completed their campaign of discrimination and retaliation against Ms. Ellman by terminating her employment on pretextual grounds.

## PARTIES

7.      Ms. Ellman, a female, resides in the City and State of New York. She is a citizen of the United States.

8.      The Defendants are individuals and corporations with who have homes and offices within this judicial district and elsewhere. The Companies are technology companies that design, develop and manufacture home monitoring and automation software applications and hardware equipment. These Companies have interlocking boards of directors and have many of the same shareholders.

9.      Ms. Ellman was employed by the Companies from October 1, 2001 until February 6, 2004.

10.      The Companies meet the definition of "employer" under Title VII, the State HRL and the City HRL.

## JURISDICTION

11.      This Court has subject matter jurisdiction over the Title VII claim under 28 U.S.C. §§ 1331 and 1343, because it arises under the laws of the United States and is brought to recover damages for deprivation of equal rights. This Court has supplemental subject matter jurisdiction over the State HRL and City HRL claims under 28 U.S.C. § 1367, because they arise from a common nucleus of operative facts with the

federal claims and are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

12.     Ms. Ellman has complied fully with any and all prerequisites to jurisdiction in this Court under Title VII, the State HRL.

13.     Contemporaneously with the filing of this Complaint, Ms. Ellman has mailed a copy of this Complaint to the New York City Commission of Human Rights and the Office of the Corporation Counsel of the City of New York, satisfying the notice requirements of Section 8-502 of the New York City Administrative Code.

14.     On or about February 24, 2004, Ms. Ellman filed a timely charge of discrimination against Xanboo, Inc., RDI, Inc., William Diamond, Robert Diamond and James Diamond, with the Equal Employment Opportunity Commission ("EEOC") complaining of the unlawful actions described herein.

15.     The EEOC issued its Notice of Right to Sue on January 13, 2005 and it was received several days thereafter.

## VENUE

16.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b), (c) and 42 U.S.C. § 2000e-5(f)(3), because Defendants have offices and conduct business, and can be found in this district, and the causes of action arose and the acts and omissions complained of occurred therein.

## DISCRIMINATORY REMARKS AND ENVIRONMENT AND DISPARATE TERMS AND CONDITIONS OF EMPLOYMENT

17.     Throughout Ms. Ellman's tenure, on a regular basis, Defendants permitted male employees of the Companies to make gender biased and sexually charged remarks and to speak explicitly about their sexual experiences.

18.     One month after Ms. Ellman joined the Companies, Bill came into her office and used her computer to show her sexually explicit pictures on the internet of women he was choosing to hire for a friend's bachelor party. After the party, he bragged openly to employees that he had sex with one or more of the women whom he hired for his friend's bachelor party.

19.     Shortly before his own wedding, Bill bragged to employees that he had sex with one of the women hired for his own bachelor party.

20.     His sexually explicit comments set the tone for the employees of the Companies, and were distasteful to Ms. Ellman and other women in the office.

21.     Bill commented to Ms. Ellman that a department did not follow technical specifications that Ms. Ellman provided because she is a woman, implying that the same technical specifications would have been followed if they came from a man.

22.     A Senior Vice President remarked at a meeting of the executive staff, that a woman who was the Director of Customer Service did not like Ms. Ellman, and that it was a case of "two women going at it." Ms. Ellman was offended by this remark.

23.     On a number of occasions, Ms. Ellman pointed out these inappropriate remarks. Though Bill and others acknowledged that the remarks were inappropriate, they dismissed Ms. Ellman's complaints and took no action.

24.     Beginning in October of 2003, Bill began to pick on Ms. Ellman on a daily basis and in front of other members of the executive staff and customers.

25.     He began to do this because he had made an error with the Company's most important customer and had misdirected Ms. Ellman and a male

employee, Babak Rezvani to deal with the customer in a particular and very aggressive way.

26.     When Bill learned that the client had complained about the aggressive manner with which they had been dealt, Bill decided to scapegoat Ms. Ellman for the error. He chose not to scapegoat Rezvani.

27.     Upon information and belief, Bill chose to scapegoat and criticize Ms. Ellman, and thereafter to target her with harassment and abuse, because her gender made her the easiest target of everyone in senior staff. He knew that neither James nor Bob would stop him from targeting Ms. Ellman, treating her differently than male employees, and eventually terminating her employment.

28.     In fact, neither Bob nor James took actions to stop the discrimination. In fact Bob proceeded to help Bill to treat Ms. Ellman in a discriminatory fashion.

29.     Thereafter, Ms. Ellman was told that senior management was "coming after" her and that "it was over" for her.

30.     Thereafter, Ms. Ellman, together with Rezvani and two other managers, approached Bob, and made him aware Bill's mishandling of customer and employee issues and asked him to intervene.

31.     Bob not only ignored the complaint, but also accused Ms. Ellman and Rezvani of forcing other managers to complaint. Upon information and belief, on that same day Bob and Bill told Rezvani that "it is over for Nancy." They chose to focus again, and scapegoat Ms. Ellman, and not to treat Rezvani in a similar fashion.

32.     Thereafter defendants sent Ms. Ellman hundreds of critical emails and began to blame Ms. Ellman each time another employee (including engineers and Vice Presidents who were her peers) did not complete a project exactly as Bill had expected.

33.     Defendants also began to systematically exclude Ms. Ellman from meetings, and then criticize her for not knowing what was discussed at the meetings. Defendants made it impossible for her to perform her job.

34.     On several occasions during this period, Bill asked Ms. Ellman if she wished to "call it quits." Each time she strongly expressed her desire to continue working for the Companies and her loyalty to the Companies.

## COMPLAINTS OF DISCRIMINATION
## AND DEFENDANTS' FAILURE TO RESPOND AND RETALIATION

35.     On November 5, 2003, pursuant to the written policy of Xanboo, Ms. Ellman complained to Gary Berg, the Director of Finance. She informed him that she was being treated differently than her male coworkers on the basis of her gender.

36.     Berg responded that he did not believe that the treatment was discriminatory or gender based and he did not see a reason to investigate.

37.     After Ms. Ellman confirmed in writing that Berg would not investigate her complaint, Berg responded that he would investigate, but again said that he did not believe Ms. Ellman was being discriminated against on the basis of her gender.

38.     On November 6, 2003, one day later, Berg and Bill met with Ms. Ellman and gave her a written performance plan indicating that they planned to meet with her every three weeks to monitor her performance and she would face termination if she

did not improve her performance in three weeks. This was the first disciplinary notice Ms. Ellman had ever received since she joined the Companies.

39.    When Ms. Ellman asked Berg what his investigation had comprised, he said he had spoken only to Bill. Upon information and belief, after this complaint, Defendants began searching for a plausible excuse to terminate her employment.

40.    On November 6, 2003 Ms. Ellman submitted a written rebuttal to the performance plan, again complaining of discrimination and retaliation.

41.    Again, Berg said he would investigate further. On December 11, Berg stated he had completed his investigation and had concluded no discrimination had taken place. He admitted that he had never spoken to Rezvani who was the key witness to the discrimination. He and Bill also praised Ms. Ellman's performance, and though nothing had changed, they told her it was far improved.

42.    However, simultaneously, Bill continued to remove Ms. Ellman's duties, barrage her with daily emails criticizing and questioning her every action.

43.    Bill removed her oversight of the Quality Assurance and Customer Service departments.

44.    Bill also invited the male executive staff to attend a trade show in Las Vegas but excluded Ms. Ellman, though Ms. Ellman was the project manager for many of the customers who were exhibiting products at the trade show.

45.    Bill also continued to make sexist remarks. At a management meeting he commented that he could not imagine a woman using the remote control devices that Xanboo manufactured through RDI. Specifically, he said "could you

actually see a woman picking this thing up and using it?  I can't even get [my wife] to use out remote control for our TV set."

46.     On January 19, 2004, Ms. Ellman again complained to Berg that Bill continued to treat her unfairly because of her gender, and that he had become more hostile to her and was taking away her job duties in retaliation for her complaint.  Ms. Ellman made similar complaints through her counsel to Defendants' then counsel, Gregg Riolo of Jackson Lewis.

47.     This complaint resulted in a January 20, 2004 meeting between Ms. Ellman, Bill and Berg, in which Bill acted in a hostile manner towards Ms. Ellman.  Though Berg acknowledged at the meeting that Bill was acting hostile and inappropriately, he took no actions to prevent Bill from continuing to discriminate and retaliate against Ms. Ellman.

48.     In the weeks that followed, Bill asked Ms. Ellman to report to Rob Galvin, the director of Quality Assurance who had reported to her only one month earlier.

49.     Bill also forced Ms. Ellman to work on a weekend when she was ill and under doctor's orders to stay home and rest to recover from her illness.   She complied with Bill's request to show her continued loyalty to the Companies.

50.     As a final effort to find a plausible excuse to terminate Ms. Ellman's employment, Bill asked his Accounts Payable Administrator to send out an email to all employees about an unaccounted UPS transaction.  Ms. Ellman realized that she had forgotten to reimburse the company for a $6.80 transaction.  When she called, the Accounts Payable Administrator told her that Bill already knew it was her transaction but

were making an unusually big deal over it.  Ms. Ellman immediately called Berg and told

him of her mistake and reimbursed the Xanboo the $6.80 that day.

51.    On February 4, 2004, Ms. Ellman made another plea to Berg to

help her stop Bill from treating her in a discriminatory and retaliatory manner.  On

February 5, 2004 Berg said he would not get involved.

52.    Then on February 6, 2004, Berg and Bill informed Ms. Ellman that

the officers of the Companies had decided to terminate her employment due to

performance issues.  She was immediately escorted out of the office.

## MS. ELLMAN'S LOSSES RESULTING FROM
## DEFENDANTS' DISCRIMINATION AND RETALIATION

53.    All of the foregoing conduct by Defendants was part of a pattern

and practice of discrimination by Defendants against female professionals at the

Companies.

54.    As a result of Defendants' discrimination and retaliation, Ms.

Ellman has suffered substantial loss of income and employment-related benefits.  Since

the time of her hire, Defendants have paid Ms. Ellman less than it would have paid her if

she had not been subjected to gender discrimination and retaliation, and since her

termination she has lost considerable wages and benefits.

55.    As a result of Defendants' discrimination and retaliation, Ms.

Ellman has suffered substantial harm to her reputation in the technology community,

adverse effects on her career, protracted unemployment, and substantial emotional harm

and distress.

## COUNT I

### TITLE VII

56.    Ms. Ellman incorporates by reference all of the preceding paragraphs.

57.    Defendants have intentionally discriminated and retaliated against Ms. Ellman by, among other things:

      a.    denying her promotional opportunities because of her gender and her protected anti-discrimination activities;

      b.    providing her with less favorable compensation and other terms and conditions of employment because of her gender and her protected anti-discrimination activities;

      c.    maintaining a work environment that was hostile to Ms. Ellman because of her protected anti-discrimination activities, which environment was severe or pervasive enough to alter her terms and conditions of employment; and

      d.    terminating her employment because of her gender and her protected anti-discrimination activities.

58.    Such conduct by Defendants constitutes unlawful discrimination, harassment, and retaliation in violation of Title VII.

59.    Such conduct by Defendants constitutes a malicious, willful, and reckless violation of Ms. Ellman's rights under Title VII.

## COUNT II

## <u>STATE HRL</u>

60.     Ms. Ellman incorporates by reference all of the preceding paragraphs.

61.     Such conduct by Defendants constitutes unlawful discrimination, harassment, and retaliation in violation of the New York State Human Rights Law.

## COUNT III

## <u>CITY HRL</u>

62.     Ms. Ellman incorporates by reference all of the preceding paragraphs.

63.     Such conduct by Defendants constitutes unlawful discrimination, harassment, and retaliation in violation of the New York City Human Rights Law.

64.     Such conduct by Defendants constitutes a malicious, willful, and reckless violation of the New York City Human Rights Law.

65.     Plaintiff respectfully requests that upon trial this Court enter judgment:

a.     Declaring that Defendants' actions, policies, and practices violated Title VII, the State HRL, and the City HRL;

b.     Permanently enjoining Defendants (and their officers, agents, and successors) from engaging in actions, policies, or practices that discriminate against professional employees because of their gender or that discriminate or retaliate against any employees because of their participation in this lawsuit, in Ms. Ellman's

opposition to discrimination by Defendants or in any other conduct protected by Title VII, the State HRL, or the City HRL;

c.    Ordering appropriate equitable relief to prevent, correct, and remedy past and future discrimination against female professional employees and to prevent, correct, and remedy past and future discrimination or retaliation against all employees who engage in conduct protected by Title VII, the State HRL, or the City HRL;

d.    Directing Defendants to make Ms. Ellman whole by providing her with back pay, reinstatement or front pay in lieu thereof, and compensation for all lost or diminished employment-related compensation or benefits, past or future;

e.    Directing Defendants to pay Ms. Ellman compensatory damages for injury to her reputation, for the emotional distress she suffered, for adverse effects on her career, and for diminished earning capacity resulting from the discriminatory and retaliatory actions of Defendants.

f.    Directing Defendants to pay Ms. Ellman a portion of its profits during the relevant period as punitive damages to punish and deter continuation of Defendants unlawful employment practices;

g.    Awarding Ms. Ellman reasonable attorneys' fees and costs, as provided by Title VII, 42 U.S.C. § 1988, and the City HRL;

h.    Awarding Ms. Ellman prejudgment interest on all monies awarded to her;

i.    Granting such additional relief as this Court deems just and proper; and

j.      JURY DEMAND, Plaintiff demands a trial by jury on all claims properly triable by a jury.

Dated:        New York, New York
              April 11, 2005

                                        MOREA & SCHWARTZ, P.C.

                                        By:  _____
                                             Aliza F. Herzberg (AH 1120)

                                        Attorneys for Plaintiff NANCY ELLMAN
                                        120 Broadway, Suite 1010
                                        New York, New York 10271-1096
                                        Telephone:  (212) 810-2400
                                        Facsimile:  (212) 810-2410